1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| IN RE: AMERANTH CASES, | CASE NO. 11cv1810 DMS (WVG) |
|---|---|
| | **ORDER GRANTING DEFENDANTS DOMINO'S PIZZA, LLC AND DOMINO'S PIZZA, INC.'S MOTION FOR SUMMARY JUDGMENT OF UNPATENTABILITY** |

This case comes before the Court on the motion for summary judgment of unpatentability of the sole remaining patent in this case, United States Patent Number 8,146,077 ("the '077 Patent"). The motion was originally filed by Defendant Pizza Hut, LLC. Ameranth filed an opposition to the motion, and Pizza Hut filed a reply. After the motion was reset for hearing, Ameranth and Pizza Hut settled their case. Thereafter, Domino's filed an *ex parte* motion to join Pizza Hut's motion and to again reset the motion for hearing. The Court granted that *ex parte* motion, gave Ameranth leave to file a surreply and reset the motion for hearing. The motion came on for hearing on September 21, 2018. William Caldarelli appeared and argued for Ameranth and Frank Angileri appeared and argued for Domino's. After thoroughly considering the parties' briefs and the record on file herein, and after hearing oral argument from counsel, the Court grants the motion.

/ / /

/ / /

# I.

# BACKGROUND

The '077 Patent is entitled, "Information Management and Synchronous Communications System with Menu Generation, and Handwriting and Voice Modification of Orders." As indicated in the specification, there are four principal objects of the invention described and claimed in the '077 Patent: To provide an improved information management and synchronous communications system that (1) "facilitates user-friendly and efficient generation of computerized menus for restaurants and other applications that utilize equipment with non-PC-standard graphical formats, display sizes and/or applications[,]" (2) "provides for entry, management and communication of information from the operator as well as to and from another computer, Web page menu, remote digital device using a standard hardwired connection, the internet or a wireless link[,] (3) "is small, affordable and lightweight yet incorporates a user-friendly operator interface and displays menus in a readily comprehensible format[,]" and (4) "enables automatic updating of both wireless and internet menu systems when a new menu item is added, modified or deleted from any element of the system." ('077 Patent at 2:61-3:17.) There are eighteen claims in the '077 Patent, three independent and fifteen dependent. Claim 1 is representative, and provides:

> An information management and real time synchronous communications system for configuring and transmitting hospitality menus comprising:
>
> a. a central processing unit,
>
> b. a data storage device connected to said central processing unit,
>
> c. an operating system including a first graphical user interface,
>
> d. a master menu including at least menu categories, menu items and modifiers, wherein said master menu is capable of being stored on said data storage device pursuant to a master menu file structure and said master menu is capable of being configured for display to facilitate user operations in at least one window of said first graphical user interface as cascaded sets of linked graphical user interface screens, and

e.   menu configuration software enabled to generate a programmed handheld menu configuration from said master menu for wireless transmission to and programmed for display on a wireless handheld computing device, said programmed handheld menu configuration comprising at least menu categories, menu items and modifiers and wherein the menu configuration software is enabled to generate said programmed handheld menu configuration by utilizing parameters from the master menu file structure defining at least the menu categories, menu items and modifiers of the master menu such that at least the menu categories, menu items and modifiers comprising the programmed handheld menu configuration are synchronized in real time with analogous information comprising the master menu,

wherein the menu configuration software is further enabled to generate the programmed handheld menu configuration in conformity with a customized display layout unique to the wireless handheld computing device to facilitate user operations with and display of the programmed handheld menu configuration on the display screen of a handheld graphical user interface integral with the wireless handheld computing device, wherein said customized display layout is compatible with the displayable size of the handheld graphical user interface wherein the programmed handheld menu configuration is configured by the menu configuration software for display as programmed cascaded sets of linked graphical user interface screens appropriate for the customized display layout of the wireless handheld computing device, wherein said programmed cascaded linked graphical user interface screens for display of the handheld menu configuration are configured differently from the cascaded sets of linked graphical user interface screens for display of the master menu on said first graphical user interface, and

wherein the system is enabled for real time synchronous communications to and from the wireless handheld computing device utilizing the programmed handheld menu configuration including the capability of real time synchronous transmission of the programmed handheld menu configuration to the wireless handheld computing device and real time synchronous transmissions of selections made from the handheld menu configuration on the wireless handheld computing device, and

wherein the system is further enabled to automatically format the programmed handheld menu configuration for display as cascaded sets of linked graphical user interface screens appropriate for a customized display layout of at least two different wireless handheld computing device display sizes in the same connected system, and

wherein a cascaded set of linked graphical user interface screens for a wireless handheld computing device in the system includes a different number of user interface screens from at least one other wireless handheld computing device in the system.

(*Id.* at 15:56-16:61.)

The '077 Patent was filed on April 22, 2005, and is a continuation of United States Patent Number 6,982,733 ("the '733 Patent"), which in turn is a continuation-in-part of United States Patent Number 6,384,850 ("the '850 Patent). United States Patent Number 6,871,325 ("the '325 Patent") is also part of this patent family, and is a continuation of the '850 Patent. The specification of the '077 Patent is identical to that of the '733 Patent, and it is "largely the same as [the '850 and '325 Patents], containing two additional figures and some additional description." *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1234 n.1 (Fed. Cir. 2016).[1]

These consolidated cases, when originally filed in 2011, alleged infringement of the '850 and '325 Patents only. The '733 and '077 Patents were added to the case in subsequent pleadings. In 2013, a majority of Defendants in these cases filed petitions with the Patent Trial and Appeal Board ("PTAB") seeking review of the '850, '325 and '733 Patents under the Transitional Program for Covered Business Method ("CBM") Patents. The PTAB instituted review on all three petitions, and it found certain claims of these three patents unpatentable under 35 U.S.C. § 101. On appeal, the Federal Circuit affirmed the PTAB's determinations of unpatentability, and reversed the PTAB's determinations that the other claims were patentable. *Id.* at 1245. Specifically, the Federal Circuit found all instituted claims of the '850, '325 and '733 Patents unpatentable under § 101. *Id.* In light of that decision, the '850, '325 and '733 Patents are no longer at issue here.

Various Defendants in these cases also twice petitioned the PTAB for CBM review of the '077 Patent. The first of those petitions was filed in 2014, and was denied. (*See* Decl. of John Osborne in Supp. of Opp'n to Mot. ("Osborne Decl."), Ex. 9.) The second petition was filed in 2017, after the Supreme Court's decision in *Alice*

///

---

[1] Exhibit A to the Declaration of Melissa Smith in support of Pizza Hut's motion is a version of the '077 Patent that highlights those portions of the specification that were not included in the specification of the '850 Patent. (*See* ECF No. 1120-3.)

*Corp. Pty Ltd. v. CLS Bank Int'l*, ___ U.S. ___, 138 S.Ct. 2347 (2014), and the Federal Circuit's decision in *Apple*.  That petition was also denied.  (*See* Osborne Decl., Ex. 5.)

## II.

## DISCUSSION

Domino's moves for summary judgment that the '077 Patent is unpatentable under § 101.  Specifically, Domino's argues the claims of the '077 Patent are directed to an abstract idea, and the claim elements, considered individually and in combination, fail to transform that abstract idea into a patent-eligible invention.

Section 101 of the Patent Act provides, "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101.  The Supreme Court has "'long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable.'"  *Alice*, 134 S.Ct. at 2354 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. ___, 133 S.Ct. 2107, 2116 (2013)).  The reason for this exception is "pre-emption. [citation omitted] Laws of nature, natural phenomena, and abstract ideas are 'the basic tools of scientific and technological work.'"  *Id.* (quoting *Myriad*, 133 S.Ct. at 2116) (internal quotation marks omitted).  "'[M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it,' thereby thwarting the primary object of the patent laws."  *Id.* (quoting *Mayo Collaborative Services v. Prometheus Labs., Inc.*, 566 U.S. ___, 132 S.Ct. 1289, 1293 (2012)).  The Supreme Court has also stated, however, that courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law."  *Id.* (citing *Mayo*, 132 S.Ct. at 1293-94).  As stated in *Alice*, courts "must distinguish between patents that claim the 'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks into something more, thereby 'transform[ing]' them into a patent-eligible invention[.]"  *Id.* (quoting *Mayo*, 132 S.Ct. at 1294, 1303).

The test for determining patent-eligibility is two-pronged. "First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* at 2355. This "'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'" *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (quoting *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)). At stage one, courts "look to whether the claims in the patent focus on a specific means or method, or are instead directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery." *Two-Way Media Ltd. v. Comcast Cable Communications, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017), *pet. for cert. filed*, (U.S. July 27, 2018) (No. 18-124), (citing *McRO, Inc. v. Bandai Namco Games Am., Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016)).

If the claims are directed to an abstract idea, courts then proceed to the second step, which asks "'[w]hat else is there in the claims before us?'" *Alice*, 132 S.Ct. at 2355 (quoting *Mayo*, 132 S.Ct. at 1296-97). "To answer that question, we consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 132 S.Ct. at 1298, 1297). The Supreme Court "described step two of this analysis as a search for an 'inventive concept'–i.e, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (quoting *Mayo*, 132 S.Ct. at 1294) (quotation marks omitted).

"Patent eligibility under § 101 presents an issue of law that [the Federal Circuit] review[s] de novo." *Accenture Global Servs., GmbH v. Guideware Software, Inc.*, 728 F.3d 1336, 1340-41 (Fed. Cir. 2013) (citing *Bancorp Servs., LLC v. SunLife Assurance Co. of Can.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012)). "This legal conclusion may contain underlying factual issues." *Id.* at 1341 (citing *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1339 (Fed. Cir. 2013)). However, "it is also possible, as numerous cases have

recognized, that a § 101 analysis may sometimes be undertaken without resolving factual issues." *Mortgage Grader, Inc. v. First Choice Loan Servs., Inc.*, 811 F.3d 1314, 1325 (Fed. Cir. 2016). In that circumstance, "the § 101 inquiry may appropriately be resolved on a motion for summary judgment." *Id.*

### A.     Step One - Abstract Idea

"The 'abstract ideas' category embodies 'the longstanding rule that [a]n idea of itself is not patentable.'" *Alice*, 134 S.Ct. at 2355 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)). The Federal Circuit has recognized that "'[i]nformation as such is an intangible' and that collecting, analyzing, and displaying that information, without more, is an abstract idea." *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1344 (Fed. Cir. 2018) (citing *Elec. Power Grp., LLC v. Alstom*, 830 F.3d 1350, 1353-54 (Fed. Cir. 2016)). *See also Intellectual Ventures I LLC v. Capital One Financial Corp.* ("*Intellectual Ventures III*"), 850 F.3d 1332, 1340 (Fed. Cir. 2017) (stating collecting, displaying and manipulating data is abstract idea). It has also stated, "[t]he category of abstract ideas embraces 'fundamental economic practice[s] long prevalent in our system of commerce,' including 'longstanding commercial practice[s]' and 'methods of organizing human activity[.]'" *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016) (quoting *Alice*, 134 S.Ct. at 2356). This is so even if the practices or methods are "performed on a computer[,]" *Enfish*, 822 F.3d at 1334, or are limited "to a particular field of use or technological environment, such as the Internet." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015). At *Alice* step one, the key consideration is "'whether the claims ... focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery.'" *Smart Systems Innovations, LLC v. Chicago Transit Authority*, 873 F.3d 1364, 1371 (Fed. Cir. 2017) (quoting *McRO*, 837 F.3d at 1313). "The Federal Circuit has recognized that this process sometimes involves 'close calls about how to characterize what the claims are directed to.'" *Local Intelligence, LLC v. HTC America,*

*Inc.*, No. 5:17-cv-06437-EJD, 2018 WL 1697127, at *4 (N.D. Cal. Apr. 6, 2018) (quoting *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016)).  It has also "acknowledged that 'precision has been elusive in defining an all-purpose boundary between the abstract and the concrete.'" *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016), *cert. denied*, ___ U.S. ___, 137 S.Ct. 1596 (2017), (quoting *Internet Patents*, 790 F.3d at 1345).

Here, the parties dispute what the claims of the '077 Patent are directed to. Domino's argues the claims are directed to the abstract idea of configuring and transmitting menu information.  Ameranth is less clear in what the claims are directed to.  In its initial opposition to the motion, it asserted "[t]he invention was, inter alia, in the software which configured the hardware to perform the inventive functions[,]" and that the claims were "directed to specific implementations of 'master menus' whereby they are, inter alia, used to configure 'programmed handheld menu configurations' ('PHMC') by using the master menu 'file structure' and are synchronized with the handheld PHMC."  (Opp'n at 11.)  In the supplemental opposition, Ameranth has retreated from its position that the invention is in the software, and is now explaining the claims by reference to the problem allegedly being solved, which Ameranth describes as "the challenges of synchronizing and automatically reformatting hospitality information contained in a master menu/master database with different wireless handheld devices with varying display screen sizes and characteristics[.]" (Supp. Opp'n at 2-3.)  This reference to the problem, however, is not a complete or concise explanation of what the claims are directed to.  On their face, the claims are directed to a system for (1) configuring and transmitting hospitality information from a master menu/database to wireless handheld devices with different display screen sizes and (2) enabling real-time synchronous communications and formatting between the wireless handheld devices and the master database.

/ / /

In *Apple*, the Federal Circuit found the claims of the '850, '325 and '733 Patents were directed to an abstract idea. 842 F.3d at 1241. The claims there were directed to "systems including menus with particular features." *Id.* Here, the claims include additional limitations, namely, wireless handheld devices with different display screen sizes, and enabling real-time synchronous communications and formatting between the devices in the system. However, none of those limitations fills the void set out by the Federal Circuit in *Apple*. In other words, despite the additional limitations, the claims here, like those in the related patents, "do not claim a particular way of programming or designing the software to create menus that have these features, but instead merely claim the resulting systems." *Id.*

Ameranth attempts to avoid this result by relying on the two PTAB decisions denying the requests to institute CBM review of the '077 Patent. The first of those decisions, however, was issued before the Federal Circuit's decision in *Apple*. That decision also relies on *Ultramercial*, 722 F.3d 1335, which was subsequently vacated by the Supreme Court.[2] (*See* Osborne Decl., Ex. 9 at 34.) And the second decision does little more than explain why the first decision was correct. (*See* Osborne Decl., Ex. 5.) This Court is not particularly persuaded by the reasoning of those decisions, and in any event, those decisions are not binding on this Court.

Ameranth also relies on three cases: *Core Wireless Licensing S.A.R.L. v. LG-Electronics, Inc.*, 880 F.3d 1356 (Fed. Cir. 2018), *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1258 (Fed. Cir. 2017), and *Local Intelligence*, 2018 WL 1697127. But each of those cases is distinguishable.

In *Core Wireless* and *Local Intelligence*, the patents at issue "disclose[d] improved display interfaces, particularly for electronic devices with small screens like mobile telephones." 880 F.3d at 1359. *See also Local Intelligence*, 2018 WL 1697127, at *8 (finding claims at issue indistinguishable from claims at issue in *Core Wireless*).

_____

[2] In a revised decision, the Federal Circuit found the claims in *Ultramercial* were "patent-ineligible under § 101." *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1048 (Fed. Cir. 2017).

Similarly, in *Visual Memory*, the asserted claims were "directed to a technological improvement: an enhanced computer memory system." 867 F.3d at 1259. In essence, the claims in both cases were "directed to a specific improvement in the capabilities of computing devices[.]" *Core Wireless*, 880 F.3d at 1361-62.

Unlike the claims in those cases, the claims of the '077 Patent are not directed to improving the capabilities of any particular computing device. Rather, the '077 Patent is directed to "computerization" of "paper-based ordering, waitlist and reservations management ... in the hospitality industry." ('077 Patent at 2:45-57.") (*See also* Rep. Tr. (Draft) at 4, Sept. 21, 2018 (describing problem being solved as "taking the large-scale paper menus that we have all seen and trying to get them down into a blackberry screen in a way that was usable and readable.")) And the claims themselves are directed to the resulting system wherein hospitality information is configured and transmitted to wireless devices with different display screen sizes, and those devices are able to engage in real-time synchronous communication with other devices in the system. Like the claims of the '850, 325 and '733 Patents, which the Federal Circuit found to be patent-ineligible, the claims of the '077 Patent:

> do not claim a particular way of programming or designing the software to create menus that have [the claimed] features, but instead merely claim the resulting systems. [citation omitted] Essentially, the claims are directed to certain functionality–here, the ability to generate menus with certain features. Alternatively, the claims are not directed to a specific improvement in the way computers operate.

*Apple*, 842 F.3d at 1241 (citation omitted). To be sure, the claims of the '077 Patent include functionality in addition to the generation and transmission of menus, but the inclusion of additional steps does not change the nature of the underlying invention, which is "directed to an abstract idea." *Id.* *See also Interval Licensing*, 896 F.3d at 1344-45 (finding claims "directed to an abstract idea because they consist of generic and conventional information acquisition and organization steps that are connected to, but do not convert, the abstract idea–displaying a second set of data without interfering with a first set of data–into a particular conception of how to carry out that concept.");

*Uniloc USA, Inc. v. HTC America, Inc.*, No. C17-1558JLR, 2018 WL 30008870, at *7 (W.D. Wash. June 15, 2018), *appeal docketed*, No. 18-2185 (Fed. Cir. July 23, 2018), (finding claims directed to abstract idea where they were "directed to a result, not a specific means or method" and were "not technological improvements[.]") Thus, the Court proceeds to step two of the § 101 inquiry.

**B.    Step Two - Inventive Concept**

The second step of the § 101 inquiry "is the search for an inventive concept, which is something sufficient to ensure that the claim amounts to significantly more than the abstract idea itself." *Secured Mail Solutions LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 911 (Fed. Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S.Ct. 2000 (May 14, 2018), (citing *Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343, 1347 (Fed. Cir. 2014)). Here, "we 'look with more specificity at what the claim elements add, in order to determine whether they identify an inventive concept in the application of the ineligible subject matter to which the claim is directed." *Intellectual Ventures III*, 850 F.3d at 1338 (quoting *Affinity Labs*, 838 F.3d at 1258). "To save a patent at step two, an inventive concept must be evident in the claims." *Two-Way*, 874 F.3d at 1338 (citing *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017)).

Here, claim 1 sets out a number of elements in the patented system, including: (1) Computer hardware ("a central processing unit[,]" etc.), (2) computer software ("an operating system[,]" "menu configuration software"), (3) "real-time synchronous communication" to and from the wireless handheld computing devices, and (4) "automatically format[ting] the programmed handheld menu configuration" for "at least two different wireless handheld computing device display sizes[.]"[3] Domino's goes through these elements individually and in combination, and explains why they do not transform the abstract idea discussed above into an inventive concept.

---

[3]    These elements are essentially the same as those set out in the other independent claims, 9 and 13.

As to the hardware elements, Domino's asserts those elements are typical and conventional, and Ameranth does not dispute that assertion.

As to the software elements, Domino's argues those are "commonly known." Ameranth does not dispute that argument either, nor could it in light of the specification. (*See* '077 Patent at 12:57-61 ("The software applications for performing the functions falling within the described invention can be written in any commonly used computer language.  The discrete programming steps are commonly known and thus programming details are not necessary to a full description of the invention."))

On the element of synchronization, Domino's contends that was "insignificant post-solution activity," as found by the Federal Circuit in *Apple*.  842 F.3d at 1242. Ameranth does not dispute this argument, but instead argues the synchronization element was "non-conventional." (*See* Supp. Opp'n at 18-23.)  Ameranth's argument, however, fails to acknowledge the Federal Circuit's decision in *Apple*, much less refute the  court's statement that "[t]he invention merely claims the addition of conventional computer components to well-known business practices."   842 F.3d at 1242. Ameranth's argument also fails to address the specification, which describes one of the benefits of the Windows CE® operating system as "built-in synchronization between handheld devices, internet and desktop infrastructure[.]"  ('077 Patent at 12:14-17.)

Domino's did not address the concept of "real-time" separately from the concept of "synchronization," but that element, too, fails to demonstrate an inventive concept. As stated by this Court in a previous case, "[r]eal-time execution is essentially adding a 'but faster' step to the claim." *Clarilogic, Inc. v. Formfree Holdings Corp.*, No. 15-cv-41 DMS (NLS), 2016 WL 3247890, at *2 (S.D. Cal. Mar. 4, 2016).  And the simple inclusion of a "real-time" feature through the use of "entirely conventional, generic technology[,]" which is what the claims of the '077 Patent recite, does not provide an inventive concept. *Elec. Power Grp.*, 830 F.3d at 1356.  *See also Two-Way Media*, 874 F.3d at 1340-41 (finding no inventive concept in claim requiring "receiving and

/ / /

transmitting a real-time media stream" through "anything other than conventional computer and network components according to their ordinary functions.")

The only other two elements set out in the claims are the automatic formatting of the programmed handheld menu configuration for display as cascaded sets of linked graphical user interface screens, and the requirement that the system include "a different number of user interface screens from at least one other wireless handheld computing device in the system."  On these two elements, Domino's again says they were "commonplace," and Ameranth again does not dispute that assertion.  Instead, it reverts to its unconventionality argument.  That argument, however, is little more than *ipse dixit*.  And automatically formatting the programmed handheld menu configuration in a particular way and for more than one handheld device adds little, if anything, to the invention beyond the concept of synchronization discussed above.  That Ameranth has described the concept in different terms does not make it any more inventive.  *See Intellectual Ventures III*, 850 F.3d at 1342 ("The mere fact that the inventor applied coined labels to conventional structures does not make the underlying concept inventive.")

As with the related patents, there is nothing in these elements, either individually or in combination that "transform[s] the claimed abstract idea into a patent-eligible application of the abstract idea." *Apple*, 842 F.3d at 1242.  Accordingly, the asserted claims of the '077 Patent are unpatentable under § 101.

**III.**

**CONCLUSION**

For these reasons, the Court grants Domino's motion for summary judgment of unpatentability, and vacates all dates currently set in these cases.  The parties shall meet and confer on the form of judgment, *i.e.*, whether judgment should be entered in the

/ / /

/ / /

/ / /

lead case on all claims or whether judgment should be entered in each individual case, and submit either a joint proposed judgment/judgments or a joint status report on or before **October 2, 2018**.

      **IT IS SO ORDERED**.

DATED:  September 25, 2018

_____

HON. DANA M. SABRAW
United States District Judge